UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DOUGLAS WARNEY,


                                    Plaintiff,

                                                                DECISION AND ORDER

                                                                07-CV-6246L

                    v.

THE CITY OF ROCHESTER,
MONROE COUNTY,
SANDRA ADAMS, in her individual capacity,
EVELYN BEAUDRAULT, in her individual capacity,
LARRY BERNSTEIN, in his individual capacity,
STEPHEN EDGETT, in his individual capacity,
THOMAS JONES, in his individual capacity,
WENDY EVAN LEHMAN, in her individual capacity,
ROBERT GARLAND, in his individual capacity,
JOHN GROPP, in his individual capacity,
MICHAEL C. GREEN, in his individual and official capacities,
JOHN DOE OFFICERS and/or DETECTIVES #1-10,
in their individual capacities,
RICHARD ROE SUPERVISORS #1-10,
in their individual capacities,


                                    Defendants.
_____


        [A prosecutor] is the representative not of an ordinary party to a controversy, but of
        a sovereignty whose obligation to govern impartially is as compelling as its
        obligation to govern at all; and whose interest, therefore, in a criminal prosecution
        is not that it shall win a case, but that justice shall be done.   As such, *he is in a
        peculiar and very definite sense the servant of the law, the twofold aim of which is
        that guilt shall not escape or innocence suffer.*

*Berger v. United States*, 295 U.S. 78, 88 (1935) (Sutherland, J.) (emphasis added).

Douglas Warney ("Warney") was convicted of murder in 1997 in Supreme Court, Monroe County and sentenced to a range of twenty-five years to life imprisonment.  He vigorously protested his innocence at trial and thereafter.  Warney's protestations of innocence proved to be true, but regrettably his innocence was only established in 2006 when the results of newly-tested DNA and fingerprint evidence was obtained, which pointed exclusively to the actual perpetrator who thereafter confessed to the murder.

Predictably, Warney commenced this federal civil rights action against the police officers who elicited his false confession and ultimately his conviction, and the District Attorney and two Assistant District Attorneys (hereinafter, sometimes, "the prosecutors") whom he alleges delayed disclosing exculpatory information that might have effected his earlier exoneration and release from prison.

The matter before the Court now relates only to Warney's claims against the prosecutors, as well as his claim against Monroe County.  The County and the  prosecutors have moved to dismiss the causes of action against them under Fed. R. Civ. P. 12(b)(6), on the grounds of absolute or, alternatively, qualified immunity, and failure to state a claim.  For the reasons that follow, the motion is granted in part and denied in part.

## FACTS

The material facts are not in dispute and are set forth with particularity in the complaint.  On January 3, 1996, William Beason was found murdered in his apartment at 366 Chili Avenue in Rochester, New York.  He was discovered lying on his bed with nineteen stab wounds to his neck and chest.  His suite had been ransacked.  A bloodstained knife, later determined to be the murder

weapon, a bloody towel, a bloody tissue, and several fingerprints were collected from the scene. Blood evidence was also collected from underneath the victim's fingernails. Warney, who has an IQ of 68 and had undergone inpatient psychiatric treatment just days before after making crank calls to the police, was arrested and after a period of interrogation, allegedly confessed to the murder. The confession, which Warney contends was false and coerced, was introduced at trial and appears to have been one of the principal pieces of evidence against him.

Of the forensic evidence collected at the scene, the technology available at the time permitted only some of the blood evidence to be analyzed, through traditional blood typing. It was established at trial that none of that blood evidence that was tested matched Warney or the victim.

After Warney's conviction had been affirmed on direct appeal, in the fall of 2004, Warney began seeking access to the biological evidence from the Beason case in order to conduct DNA testing that he believed would exonerate him. The Monroe County District Attorney's office denied his initial request, and, thereafter, in October of 2004, Warney filed a motion under New York State's post-conviction statute, N.Y. C.P.L. 440, to gain access to all of the relevant evidence including the murder weapon, other blood evidence from the crime scene, and several items that had not been tested previously, such as the blood found under the victim's fingernails. The Monroe County District Attorney's Office opposed the request, and in an opinion issued December 15, 2004, the Monroe County Supreme Court denied Warney's N.Y. C.P.L. 440 motion.

Unknown to Warney or his lawyer, at the same time it was vigorously opposing Warney's N.Y. C.P.L. 440 motion, and his appeal of the Monroe County Supreme Court's initial denial of that motion, on the basis that the potential for exculpatory results was entirely "speculative," the Monroe

County District Attorney's Office had submitted the blood found under the victim's fingernails, as well as other items of forensic and fingerprint evidence from the Beason crime scene, for DNA testing and fingerprint analysis.  As early as late in 2005 and on February 17, 2006 at the latest, the prosecutors received verbal and written reports confirming that laboratory tests of the blood on each of the seven items submitted from the Beason crime scene revealed a single male profile, which was also consistent with the DNA found under the victim's fingernails.  The profile did **not** match Warney.  These facts were not immediately disclosed to Warney or his lawyer.

On March 2, 2006, the prosecutors learned more.  They were advised that a search of the Combined DNA Indexing System (CODIS) database maintained by the FBI had resulted in a match of the DNA profile to Eldred Johnson, a person previously convicted of murder and several slashings and burglaries, who was then confined in a correctional facility in Utica, New York.  This information also was not immediately disclosed to Warney or his lawyer.

On March 24, 2006, an evidence technician from the Rochester Police Department determined that a latent fingerprint from the Beason crime scene also matched Johnson, whose fingerprints had been on file with the statewide database  at least as early as 1996.  This report was not immediately disclosed to Warney or his counsel.

Neither the DNA testing results nor the fingerprint match were disclosed to Warney or his counsel until on May 1, 2006.  Eleven days later, on May 12, 2006, the prosecutors also advised Warney's counsel that on the previous day, May 11, 2006, Johnson had been interviewed and confessed to the murder for which Warney had been convicted in 1997.  Johnson also stated that he had acted alone, and did not know Warney.

- 4 -

On May 16, 2007, on application of the prosecutors, the Judgment and Conviction against Warney was vacated, and he was released from prison.

Warney claims that the prosecutors' delay in disclosing the highly exculpatory information that they received in February and early March 2006 violated his constitutional rights, and that he is entitled to damages. Warney claims that the prosecutors had an obligation to promptly disclose the results of the DNA evidence and fingerprint testing, and that the prosecutors' decision to delay disclosing those results for at least 72, and perhaps longer, days violated Warney's due process rights.

The prosecutors, on the other hand, contend that the delay did not implicate any constitutional rights and that it was only when the perpetrator, Johnson, confessed to the murder that disclosure was warranted. In addition, they claim that as prosecutors they are entitled to either absolute or qualified immunity for their actions relating to the above events. The moving defendants also contend that Warney's Section 1983 *Monell* claim against Monroe County should be dismissed for failure to identify the maintenance of an unconstitutional policy on the part of the County, and that claims asserted against District Attorney Green in his official capacity should also be dismissed.

## DISCUSSION

I.      **Standard on a Motion to Dismiss**

This case is in a particular posture at this time. The matter is not before the Court for trial or on a motion for summary judgment, but rather on a motion to dismiss. That procedural circumstance is pivotal to the outcome.

Federal Rule of Civil Procedure 12(b)(6) provides that a complaint may be dismissed for failure to state a claim upon which relief can be granted.  In deciding a motion to dismiss under Rule 12(b)(6), a court must "accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994), *citing Ad-Hoc Comm. of Baruch Black & Hispanic Alumni Ass'n v. Bernard M. Baruch College*, 835 F.2d 980, 982 (2d Cir. 1987).  The long-standing Rule 12(b)(6) test, which permitted dismissal only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," has been rejected recently by the United States Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, ____ U.S. ____, 127 S. Ct. 1955 (2007), which conclusively retired the "no set of facts" test and held that "a plaintiff's obligation . . . requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp.*, 127 S. Ct. at 1964-65 (citations omitted).  *See e.g.*, *Transhorn, Ltd. v. United Technologies Corp.*, 2007 U.S. App. LEXIS 21086 at *6 n. 3 (2d Cir. 2007) (concluding that *Bell Atlantic Corp.*'s holding, which addressed an antitrust claim, is not limited to that context and "affects pleading standards somewhat more broadly"); *Ashcroft v. Dept. of Corrections*, 2007 U.S. Dist. LEXIS 49079 (W.D.N.Y. 2007) (discussing and applying the *Bell Atlantic Corp.* standard).  It is, therefore, within this framework that I analyze the pending motion.

## II.    Section 1983

Section 1983 states in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be

subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

42 U.S.C. §1983.

To state a claim pursuant to Section 1983, a plaintiff must allege that: (1) the defendants deprived him of a right, privilege, or immunity secured to him by the United States Constitution or other federal law; and (2) the defendants caused the deprivation while acting under color of state law. *See Parratt v. Taylor*, 451 U.S. 527, 535 (1981).[1]

Warney alleges that the prosecutors violated his constitutional rights when they unreasonably delayed disclosing the exculpatory DNA testing results and fingerprint analysis to him. The prosecutors concede that Warney had a right -- a constitutional one -- to disclosure of the evidence. Their position, though, is that the several month delay in disclosing the evidence did not violate the Constitution. Furthermore, they assert that, regardless of the facts set forth in the complaint, they are each entitled to either absolute or qualified immunity for their actions.

### III.    Section 1983 Claims Against Prosecutors: Absolute Immunity

The defense of absolute immunity protects government officials from individual liability for actions undertaken "in the exercise of their duties." *Burns v. Reed*, 500 U.S. 478, 486-487 (1991). Accordingly, prosecutors are afforded immunity for their conduct in "initiating a prosecution and in presenting the State's case," inasmuch as that conduct is "intimately associated with *the judicial phase of the criminal process*." *Imbler v. Pachtman*. 424 U.S. 409, 430-431 (1976) (emphasis

---

[1]  The parties do not dispute that the prosecutors were, at all times relevant, acting under color of state law and no issue has been raised concerning that requirement.

added).  Conduct which is merely investigative or administrative, regardless of whether it overlaps

with litigation, is thus not protected by absolute immunity.  *Kalina v. Fletcher*, 522 U.S. 118, 129-

131 (1997); *Buckley*, 509 U.S. 273; *Burns*, 500 U.S. at 492.  In determining whether a prosecutor's

actions involve advocacy in a criminal proceeding, the court must examine the "nature of the

function performed, not the identity of the actor who performed it."  *Kalina*, 522 U.S. at 118.

The prosecutors contend that their actions in delaying disclosure of the exculpatory evidence

to Warney are entitled to absolute immunity.  I disagree.  The function performed here by the

prosecutors was clearly not one of advocacy but of investigation.  The prosecutors' acts here were

no different than a law enforcement officials' acts in obtaining and allegedly suppressing favorable

evidence.

The Complaint, which is the only statement of facts the Court can consider on a motion to

dismiss, alleges that this conduct took place after Warney's conviction had been affirmed and his

appeal denied.  Because the relevant litigation was long over by the time the exculpatory evidence

was obtained, and given the transparently investigative nature of the prosecutors' acts in submitting

the evidence for DNA testing and fingerprint analysis, I find that the prosecutors are not entitled to

absolute immunity for that conduct.  *See e.g.*, *Yarris v. County of Delaware*, 465 F.3d 129 (3d Cir.

2006) ("a prosecutor acting merely as a custodian of evidence under conviction" is serving a non-

prosecutorial function); *Houston v. Partee*, 978 F.2d 362, 365 (7th Cir. 1992) (prosecutors not

entitled to absolute immunity for withholding disclosure of exculpatory statements post-conviction,

where evidence was discovered while investigating other crimes).

**IV.     Section 1983 Claims Against Prosecutors: Qualified Immunity**

The prosecutors claim that if they are not entitled to absolute immunity, their actions in delaying disclosure of the DNA and fingerprint testing results to Warney are covered by qualified immunity.  Admittedly, this is a closer question, but based on the factual allegations in the complaint, I am not prepared to rule at this time that these officials are, as a matter of law, entitled to qualified immunity for their actions.

The qualified immunity defense shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Once the defendants claim the affirmative defense of qualified immunity, the burden shifts to the plaintiff to demonstrate that the defendants are not entitled to qualified immunity.  *See Myers v. Potter*, 422 F.3d 347, 352 (6th Cir. 2005).

In determining whether qualified immunity applies, the court must first consider whether "the facts alleged show the [prosecutor's] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  *See generally Oliveira v. Mayer*, 23 F.3d 642, 648 (2d Cir, 1994); *Kerman v. City of New York*, 374 F.3d 93, 108 (2d Cir. 2004).  If the plaintiff establishes that such a violation occurred, the court will examine "whether the right was clearly established . . . in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. 194 at 201.  A plaintiff may show that a right is "clearly established" by: (1) identifying analogous case law establishing the right; or (2) showing that the conduct was "so egregious" that no reasonable person could have believed that it would not violate clearly established rights." *See Hope v. Pelzer*, 536 U.S. 259, 265

(2002)*; United States v. Lanier*, 520 U.S. 259, 265 (1997); *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001).

So, the Court must determine if the constitutional "right" allegedly violated was clearly established so that no reasonable prosecutor would have engaged in the conduct complained of here. Whether a right was "clearly established" at the pertinent time is generally a question of law.  *See Crawford-El v. Britton*, 523 U.S. 574, 589 (1998); *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985); *Harlow*, 457 U.S. at 818.  By contrast, whether a reasonable official would have reasonably believed that his conduct did not violate a clearly established right, is a mixed question of law and fact which requires a particularized focus on the pertinent facts of the case. *Kerman*, 374 F.3d at 109; *Lennon v. Miller*, 66 F.3d 416, 422 (2d Cir. 1995).  However, where, as here, there is no dispute as to the material facts, the question of reasonableness may be appropriately determined by the Court. *Kerman*, 374 F.3d at 109; *Lennon*, 66 F.3d at 421.

The United States Supreme Court's decision in *Brady v. Maryland,* 373 U.S. 83 (1963) is the fountainhead for the now well-established principle that a prosecutor is required under the Fifth Amendment to disclose exculpatory evidence to the accused in connection with trial or post-trial proceedings.  Failure to disclose evidence that is material to either guilt or punishment violates due process. *Brady*, 373 U.S. at 87.  There has been no wavering from that basic principle since *Brady* was decided over 40 years ago.

The law is now also clear that such exculpatory evidence must be timely disclosed such that it can be effectively utilized by the defendant to combat his conviction.  *See United States v. Coppa,* 267 F.3d 132, 135 (2d Cir. 2001); *United States v. Jackson,* 2008 U.S. Dist LEXIS 8877 at *4

(W.D.N.Y. 2008).  It is up to the defendant as to when and how to utilize the evidence; that call is not one for the prosecutors to make.

Here, the evidence was obtained not before or during trial proceedings but long after Warney's conviction was final.  That circumstance may well make a difference; the prosecutors contend that it does.  Warney argues, that on the particular facts of this case, it should make no difference.

Some courts examining the existence and extent of a prisoner's right to exculpatory evidence post-conviction have analyzed the issue as one involving the Fifth Amendment right to a fair trial, as addressed in *Brady* and its progeny.  Such cases have suggested that the constitutional right to disclosure of exculpatory evidence is extinguished following conviction, and in some cases, the exhaustion of appellate procedures.  *See Gibson v. Superintendent of New Jersey Dep't of Law and Public Safety - Div. of State Police*, 411 F.3d 427, 444 (3d Cir. 2005) ("[plaintiff] has pointed to no constitutional duty to disclose potentially exculpatory evidence to a convicted criminal after the criminal proceedings have concluded and we decline to conclude that such a duty exists"); *Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir. 1997) (although the duty to disclose is ongoing and extends to all stages of the judicial process, delay in disclosing exculpatory evidence discovered post-trial but prior to exhaustion of motion for post-conviction relief is not a denial of due process under *Brady*, because the evidence did not satisfy the *Brady* element of materiality to the outcome of the relevant proceeding; here, the motion for post-conviction relief).

In contrast, other courts have searched elsewhere in the Constitution to determine whether a post-conviction right to the disclosure of exculpatory evidence exists.  *See Harper v. Bohanan*,

2006 U.S. Dist. LEXIS 17439 (E.D. Tenn. 2006) (acknowledging that a due process right to disclosure of exculpatory evidence discovered post-conviction may exist, but finding that it was not "clearly established" in 1986); *Gauger v. Hendle*, 2002 U.S. Dist. LEXIS 18002 (N.D. Ill. 2002) (finding that a due process right to disclosure of post-conviction exculpatory evidence exists, but granting qualified immunity because the right was not "clearly established" in 1997), *aff'd in part, vacated in part, remanded by* 349 F.3d 354 (7th Cir. 2003) .

In *Gauger*, the United Stated District Court for the Northern District of Illinois confronted the question of whether qualified immunity shielded prosecutors from divulging exculpatory evidence to Gauger, who had been convicted of murdering his parents.  2002 U.S. Dist. LEXIS 18002.  Gauger appealed and the conviction was reversed on technical grounds and remanded for a new trial by an Illinois appellate court.  The state filed a motion to reconsider, and while that petition was pending, prosecutors were provided with transcripts of statements by an informant, which suggested that two other men, and not Gauger, had committed the murders.  The prosecutors did not disclose the transcripts to Gauger, and the state's petition for reconsideration of the remand was ultimately denied.

Based upon the near-confessions provided in the transcripts, prosecutors opted not to continue to pursue Gauger, and the men implicated in the transcripts were ultimately convicted of criminal offenses relating to the murders.  *Id*.  Gauger brought suit against the prosecutors under Section 1983, arguing that they violated his constitutional rights when they failed to disclose the exculpatory evidence while his direct appeal, and/or the state's motion for reconsideration, were pending.  *Id*.

Initially, the court rejected Gauger's attempt to characterize his allegations as stating a *Brady* claim, noting that *Brady*'s scope is limited to trial procedures.  *Gauger*, 2002 U.S. Dist. LEXIS 18002 at *26-*27.  Nonetheless, the court found that:

> [t]his does not mean . . . Gauger has no constitutional claim at all . . . Gauger's claim is really one of wrongful imprisonment, or to put it in constitutional terms, it is, arguably, the deprivation of liberty without due process of law.  "Arguably" only because [no case] the court is aware of has satisfactorily described how such a claim – the nondisclosure of exculpatory evidence obtained after a criminal defendant has been convicted – fits within the framework of the Constitution . . . With no other authority pointing the way, the court believes the Fourteenth Amendment's due process clause is the constitutional anchor for this claim.

*Gauger*, 2002 U.S. Dist. LEXIS 18002 at *28, *28 n. 1.

This Court likewise believes that the parties' attempts to analogize the instant motion to the *Brady* line of cases is misplaced, given the well-settled notion that one's Fifth Amendment fair trial rights terminate at the conclusion of trial and/or post-trial procedures.  But, the fundamental principle established in *Brady* should not be ignored completely because of the belated availability of exculpatory evidence.  Evidence, especially compelling evidence of innocence, should not be suppressed regardless of how or when it is obtained.  There is something basically inimical to our entire justice system if one is allowed to languish in jail when his prosecutors hold evidence that establishes he should not be there.

*Brady* requires evidence to be disclosed in a timely fashion so that the accused can effectively utilize it to defend against criminal charges brought by the state.  Admittedly, Warney's trial had concluded and his conviction was affirmed.  Here, Warney should have been allowed to utilize the powerful, exculpatory evidence on each and every day that he sat in jail precluded from seeking judicial relief because the prosecutors kept the evidence under wraps for several months.

As the *Gauger* court noted, however, even if a *Brady* analysis is inapposite, an individual deprived of exculpatory information cannot be without a constitutional remedy against wrongful imprisonment.

Warney had been convicted and sentenced to twenty-five years to life, ten of which he had already served.  Clearly, the state was depriving Warney of his liberty.  Warney continued to protest his innocence, and was in the process of exhausting every remedy available to him to gain access to crime-scene evidence for DNA testing to prove that innocence.  The prosecutors who prosecuted him, even while opposing his every effort to obtain that evidence, covertly had it tested themselves and ultimately held in their hands test results that undeniably pointed toward Warney's innocence. "In such a situation, they could not let him be deprived of his liberty without disclosing that evidence to him, so that he could make some use of it in trying to obtain his own freedom.  Due process required at least that much." *Gauger*, 2002 U.S. Dist. LEXIS 18002 at *37-*38.

The requirement for disclosure involves only that: disclosure to the defendant.  Such disclosure would not have been tantamount to releasing Warney.  That may have occurred, but it was up to the defendant and his attorney, and ultimately a judge, to determine whether the evidence warranted some relief.  Based on the allegations of the complaint, it is hard to see how there could be any burden or inconvenience to the prosecutors by disclosing the information.

Having determined that Warney did have a right to disclosure of the exculpatory material, the analysis turns upon whether that right is one that was "clearly established" in 2005 or early 2006. In this respect, I believe that *Gauger* and *Harper*, which found that the prosecutors were ultimately entitled to qualified immunity based solely on the lack of voluminous case law to "clearly establish"

the convicted plaintiff's due process rights to disclosure, missed the mark by neglecting to examine whether the due process right to prompt post-conviction disclosure of exculpatory evidence is one of which a reasonable prosecutor would have known. *Harper*, 2006 U.S. Dist. LEXIS 17439 at *40-*41; *Gauger*, 2002 U.S. Dist. LEXIS 18002 at *39. Based upon the facts alleged in the complaint, I find that plaintiff's allegations suggest that this is one of the "rare cases, where the constitutional violation is patently obvious" and where "widespread compliance with [the] clearly apparent law may have prevented the issue from previously being litigated" to an appreciable extent. *Denius v. Dunlap*, 209 F.3d 944, 951 (7th Cir. 2000).

Implicit in the prosecutor's duty to accomplish the "dual aim of our criminal justice system[:] 'that guilt shall not escape or innocence suffer," *U.S. v. Nobles*, 422 U.S. 225, 230 (1975), *quoting Berger*, 295 U.S. at 88, is an ongoing obligation to disclose to the imprisoned, within a reasonable time, evidence which falls into the prosecutor's hands which compellingly and forcefully exonerates the prisoner. In short, whether or not he was conversant with the holdings in *Harper* and *Gauger*, no reasonable prosecutor in 2005 or early 2006 could have believed that it was constitutionally permissible to withhold or conceal evidence from a convicted citizen, which had substantial power to exonerate him.[2] *Harper*, 2006 U.S. Dist. LEXIS 17439; *Gauger*, 2002 U.S. Dist. LEXIS 18002. *See generally Schulp v. Delo*, 513 U.S. 298, 325 (1995) (observing that "concern about the injustice

---

[2] Again, the prosecutors here do not dispute that at some point after their receipt of the exculpatory evidence, they were constitutionally required to disclose it to Warney. The crux of the parties' debate is simply whether, under the facts pleaded in the complaint, the "clearly established" duty was one that arose at the time the prosecutors learned of the exculpatory evidence, or at some later time.

that results from the conviction of an innocent person has long been at the core of our criminal justice system").

Thus, the question becomes whether the prosecutors' disclosure of the exculpatory evidence after the period alleged in the complaint, 72 days at the minimum and potentially several months, comprised reasonably timely disclosure as a matter of law, such that the prosecutors are entitled to qualified immunity. Upon examination of the circumstances as alleged in the complaint, I find that it was not.

I believe this finding is compelled by the unusually dramatic and conclusive nature of the evidence at issue, as well as the period of time that evidence was withheld – between 72 days and several months.

DNA testing, a process which analyzes chromosomal material to derive an individual's unique genetic profile, is singularly useful for forensic purposes because, "with the exception of identical twins, no two individuals have the same DNA configuration." *U.S. v. Jakobetz*, 955 F.2d 786, 791 (2d Cir. 1992) (describing DNA testing procedures in detail, and noting the probative value of DNA evidence). In fact, under New York law, DNA evidence – standing alone and uncorroborated by any other evidence – "is sufficient to prove a defendant's guilt beyond a reasonable doubt." *Harrison v. Walsh*, 2007 U.S. Dist. LEXIS 39616 at *65 (S.D.N.Y. 2007). Moreover, the credibility of properly-performed DNA test results is so significant that with respect to applications for post-conviction relief, the presence of DNA from a person other than the one convicted has been found to "cast considerable doubt on [the convicted individual's] guilt," sufficient to satisfy the stringent habeas corpus standards for obtaining federal review of a

conviction, even in the absence of a state procedural default.  *See e.g.*, *House v. Bell*, 547 U.S. 518 (2006).

Here, no reasonable prosecutor could have doubted that the DNA test results, which established that not only some, but *all* of the non-victim blood evidence collected at the crime scene, including blood evidence recovered from beneath the victim's fingernails, belonged to a single individual who was not Warney, called the correctness of Warney's conviction dramatically into question.  Beginning on that date at the earliest, and at the latest a few days later when DNA and fingerprint matches were made and the true perpetrator (a convicted felon with a record of similar crimes) was identified, "every day the prosecutors withheld the evidence was another day [Warney] was deprived of an opportunity to use that evidence to gain his liberty."  *Gauger*, 2002 U.S. Dist. LEXIS 18002 at *41.

The prosecutors here seem to acknowledge that the evidence was obviously exculpatory, but they claim that they are entitled to wait; apparently until they had more evidence warranting overturning Warney's conviction.  By taking that position, though, they unilaterally deprived the defendant of the opportunity to present this exceedingly strong evidence to a judge, which might have led to Warney's exoneration much sooner than was the case.  It may not have happened, but Warney was entitled to make that effort.

Based on the oral argument on the motion, it is not clear to me how long the prosecutors thought that they were entitled to wait.  Was it a month, three months, six months?  In my view, the stronger the exculpatory evidence, the sooner it should be disclosed to the defendant for his use.  Certainly if the prosecutors came upon a previously-unknown video of the crime itself [admittedly

a very unlikely circumstance] and Warney was not depicted, it would be hard to understand why the prosecutors would wait more than a minute to disclose that evidence.  In the case at hand, according to the complaint, the exculpatory evidence here was extremely strong and persuasive.  Fingerprint evidence and DNA evidence of this type is something prosecutors routinely employ to convince jurors of guilt.  The evidence here did not involve some whispered rumor on the street or a questionable submission by a jailhouse informant, but evidence of the strongest kind.  The evidence not only pointed away from Warney, but pointed to a person who previously engaged in stabbing his victims and was at that moment in jail for murder.   Moreover, given the fact that the prosecutors were simultaneously opposing Warney's every attempt to gain access to the evidence through litigation channels, even as they covertly tested it themselves, the necessity  of disclosing the test results as soon as practicable should have been evident.

Naturally, whether Warney will ultimately be able to establish his allegations at trial and establish damages is a question for another day.  However, constrained as I must be on a motion to dismiss, to rely only upon the facts as alleged in the complaint, the Court finds at this juncture that plaintiff's allegations that compelling evidence of his innocence was withheld from him for a period of months, are sufficient to overcome the prosecutors' claim to the defense of qualified immunity, and the prosecutors' motions to dismiss the claims against them grounded on their delayed disclosure of exculpatory evidence must be denied.

## V.   Section 1983 Official Capacity Claim Against Green

The Complaint names District Attorney Green in both his individual and official capacity, but does not specify any official capacity claim against him.  The moving defendants have urged that

to the extent any official capacity claim has been asserted against Green, it should be dismissed. Warney admits that he named Green in his official capacity "out of an abundance of caution" as the County's final policymaker with respect to his *Monell* claim against the County, and concedes that any official capacity claim against Green is subsumed therein.  Accordingly, defendant's motion to dismiss any "official capacity" claims against Green is granted.

## VI.   Section 1983 Claim Against Monroe County

Warney's complaint also sets forth a Section 1983 *Monell* cause of action against Monroe County.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  Warney alleges that the County, through its District Attorney, maintained unconstitutional customs, practices or policies relating to access to the biological evidence in Warney's case, the testing of that evidence, and the withholding of exculpatory test results, all in bad faith.

The moving defendants contend that Warney's *Monell* claim should be dismissed, because it refers solely to conduct of the District Attorney in his prosecutorial role, and does not refer to any policies and practices undertaken by the County.  *See Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988) (a district attorney in New York who is acting in his prosecutorial capacity represents the state, not a county).  Defendants further allege that Warney has failed to identify any underlying constitutional deprivation to support his Section 1983 claim.  *Monell*, 436 U.S. at 690.

Here, as in the absolute immunity context, I find that the District Attorney was not acting in a "prosecutorial" capacity with respect to the custody, testing and withholding of exculpatory biological evidence in this case, all of which occurred long after Warney's conviction.  Indeed, it appears that the definition of "prosecutorial" capacity for purposes of this analysis has been

"confined . . . to challenges to specific decision[s] of the District Attorney [concerning whether] to prosecute," a circumstance which manifestly does not apply here.  *Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir. 1992).  In contrast, to the extent he manages his office, a district attorney is considered a "county policymaker" for Section 1983 purposes, and the county may be held liable for his "management of the office – in particular the decision not to supervise or train ADAs on [federal laws and their duties pursuant to them]."  *Walker*, 974 F.2d at 301.

Moreover, as set forth above, I find that the conduct alleged in the complaint states a cause of action for violation of Warney's constitutional due process rights.  Accordingly, the defendants' motion to dismiss Warney's Section 1983 *Monell* claim against the County must be denied.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss plaintiff's Section 1983 claims against them pursuant to Fed. R. Civ. Proc. 12(b)(6) relating to their alleged failure to timely disclose exculpatory evidence, and to dismiss Warney's Section 1983 "*Monell*" claim against Monroe County (Dkt. #2), is denied.  To the extent that the complaint asserts claims against District Attorney Green in his official capacity, defendants' motion to dismiss those claims is granted, and those claims are dismissed, with prejudice.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       February 11, 2008.

- 20 -